IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2002

## ERVIN LEE HAYES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-B-835    Cheryl Blackburn, Judge**

_____

**No. M2001-02913-CCA-R3-PC - Filed December 30, 2002**

_____

The Petitioner was indicted for two counts of attempted first degree murder. Following a jury trial, the Petitioner was convicted of both counts of attempted first degree murder. The trial court sentenced the Petitioner as a Range II, multiple offender to thirty-five years for each count and ordered that the sentences be served consecutively. The Defendant appealed, and this Court affirmed the judgment of the trial court. The Tennessee Supreme Court denied permission to appeal. The Petitioner then filed a pro se motion for post-conviction relief. The trial court found that the Petitioner failed to state any grounds for which relief could be granted and ordered that the Petitioner respond within fifteen days. Receiving no response, the trial court dismissed the petition. Eventually, with permission from the trial court based on extenuating circumstances, the Petitioner filed an amended pro se petition, alleging ineffective assistance of counsel. Following an evidentiary hearing, the trial court denied the petition. The Petitioner now appeals the denial of his petition for post-conviction relief. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ, joined.

Mike J. Urquhart, Nashville, Tennessee, for the appellant, Ervin Lee Hayes.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. FACTUAL BACKGROUND

The facts of the underlying case, as described by this Court on direct appeal, are as follows:

At trial, Tawanda Parker testified that she lived with her boyfriend, Andreal McLemore, in a duplex in Nashville. She testified that after midnight on December 12, 1996, the defendant and his girlfriend knocked on her door. She testified that she knew the defendant and that he had previously been to her apartment. She testified that the defendant entered and asked if he could borrow her car, to which she replied that the car was not working because the tailpipe had fallen off. She said the defendant responded, "Do you mean to tell me that damn car ain't working?" She said she told the defendant that it was not, then the defendant pulled out a handgun from his pocket and shot Mr. McLemore. She said the defendant then shot her in the left jaw, walked toward her and shot her again in the neck. She testified that before the defendant shot her and Mr. McLemore, she and the defendant had not been arguing but had been talking in a normal tone. She said the defendant did not say anything immediately before or after he shot them.

Ms. Parker testified that she and Mr. McLemore lay still until they heard the defendant leave. She said she crawled to the telephone to dial 9-1-1 but could not dial the numbers. She said she thought she was dialing 9-1-1, but an operator kept coming on the line telling her to hang up and try again. She said she prayed and went to sleep. She said she awoke several times and tried to dial 9-1-1 but was unsuccessful. She said the next time she awoke, it was daylight. She stated that the telephone then rang, and she was able to answer it. She said it was a friend, and she told him to call the police because she had been shot. Ms. Parker testified that the police arrived shortly thereafter and that she told them that the defendant had shot them. She testified that a detective later showed her two photograph lineups. She testified that she did not see the defendant in the first lineup but that she identified him in the second one. She stated that she has been confined to a wheelchair since the shooting.

On cross-examination, Ms. Parker testified that she had known the defendant for about three months before the shooting. She stated that he lived with his mother down the street from her. She said that he had been at her house a couple of times on the day of the shooting to use her telephone. She testified that the defendant had previously bought a car and furniture from her. She said she had borrowed money from the defendant in the past but had always paid it back. She denied mentioning a robbery to one of the responding officers. She said that when the defendant was at her apartment, no one was angry, upset or yelling. She said she did not know why the defendant shot her.

Andreal McLemore testified that he had known the defendant about three months before the shooting and that the defendant had previously been in his and Ms. Parker's apartment. He said he was friendly with the defendant and never had any problems with him. He said that he was lying in bed when the defendant came to their apartment at about 12:30 a.m. on December 12. He said the defendant wanted to borrow Ms. Parker's car but could not do so because the tailpipe had fallen off. He

said he heard the defendant and Ms. Parker talking but could not hear what they were saying. He testified that he was sitting upright on the bed when the defendant shot him from about eight feet away. He said he had no conversation with the defendant before he was shot. He said the bullet struck his upper left neck, and he fell to the floor. He said that after he was shot, he heard two more shots, and Ms. Parker fell on top of him. He said that after the defendant left, Ms. Parker crawled to get the telephone but could not use it. He said they were not discovered until 1:30 p.m. the following day, and he said he was awake the entire time and was unable to move his lower body. He testified that he has been confined to a wheelchair since the shooting and that he has to live in a nursing home facility.

On cross-examination, Mr. McLemore admitted that he had served a three-year sentence for possession of cocaine in 1993. He said that neither he nor Ms. Parker had any dispute with the defendant.

Sergeant Gary Young testified that he was dispatched to the scene and discovered that the victims had been shot inside their apartment. He said he asked Ms. Parker who shot her, and she responded, "Ervin did it." On cross-examination, he testified that he did not know if the case was originally handled by a robbery unit, but he had called for a homicide unit.

Detective Frank Pierce testified that he works for the Homicide Unit and that when he arrived at the scene at about 1:30 p.m., the victims had already been transported to the hospital. He said he learned from another detective that the victims said that a man named Ervin had shot them. He said that Detective Dean Haney prepared a photograph lineup that did not contain the defendant's photograph. He said he showed the lineup to the victims, and they could not identify the defendant in the lineup. He said he prepared a second lineup containing the defendant's picture, and the victims were able to identify the defendant immediately.

On cross-examination, Detective Pierce testified that he did not preserve the first lineup. He said the photographs in the first lineup were selected by a computer based upon the information from the victims. He said he did not believe any written description of the defendant by the victims existed. On redirect examination, he testified that although he showed the first lineup to the victims, it was prepared by Detective Haney. He said that as far as he knew, the only information provided by the victims was the defendant's name.

Officer William Merrill of the Identification Division of the Metropolitan Police Department testified that he was in the area of the victims' apartment on December 12 and saw ambulances and police cars. He said that when he went inside the apartment, Ms. Parker was being treated and was unresponsive. He testified that Mr. McLemore was able to speak. He said he asked Mr. McLemore who shot him, and

Mr. McLemore responded, "Ervin." Officer Merrill testified that he found blood in several areas, including on the bed, but that he did not find any shell casings, bullet holes or weapons at the scene.

Detective Dean Haney of the Armed Robbery Unit testified that he was dispatched to the scene on the report of a potential armed robbery. He said he arrived at about 2:00 p.m. He said that the Armed Robbery Unit was dispatched because Ms. Parker had mentioned robbery to an officer on the scene. He said he looked through the apartment, but it did not look as if anything had been taken. He said a billfold and pocketbook were still in the apartment. He testified that he saw Mr. McLemore at the hospital the next day and that he asked Mr. McLemore if he had been robbed. He said that Mr. McLemore was unable to speak but that he shook his head to indicate "no." He said Mr. McLemore shook is head to indicate "yes" when he asked if Ervin had shot him. Detective Haney testified that the case was then turned over to the Homicide Unit. He testified that he assisted Detective Pierce by generating a computer lineup based upon the name "Ervin." He said he did not know whether the defendant was in the lineup, and he gave his paperwork to Detective Pierce. The jury convicted the defendant upon the foregoing evidence.

State v. Ervin Lee Hayes, No. 01C01-9809-CR-00374, 1999 Tenn. Crim. App. LEXIS 692, at ** 3-8 (Tenn. Crim. App., Nashville, July 9, 1999).

The following evidence was presented at the hearing on the petition for post-conviction relief.[1] The Petitioner testified that he completed the seventh grade. He stated that he was initially represented for approximately six or seven months by attorney Lionell Barrett, but that Mr. Barrett was allowed to withdraw and new counsel from the Public Defender's Office was appointed in February 1998. The Petitioner claimed that he did not discuss his case with his prior attorney. According to the Petitioner, his trial was scheduled for July 1998. He testified that between February 1998 and July 1998, he had approximately five or six conversations with his newly-appointed counsel. The Petitioner estimated that each conversation lasted about ten or fifteen minutes.

The Petitioner testified that he advised counsel that Sheila Bailey, his former girlfriend, and Mattie Darnell, his mother, could provide him with an alibi for the night of the offense. He testified that Wanda Poole, who was allegedly with the Petitioner at the time he shot the victims, was at his mother's home at the time of the offense, and she thus could not have been a witness to the crime. The Petitioner testified that the indictment indicated that the offense occurred at 12:30 a.m. According to the Petitioner, he was with Bailey at the time when the offense allegedly occurred. He stated that he informed counsel that he was with Bailey from 5:00 p.m. on the December 11, 1996 until 9:00 or 10:00 a.m. the next day. The Petitioner acknowledged that Wanda Poole was also his girlfriend at the time.

---

[1] We note that pages 22, 35, and 42 of the transcript from the hearing on the petition for post-conviction relief are pages from unrelated hearings and were apparently inadvertently substituted for pages from this hearing. In our view, the omissions from the transcript are not substantial and have not affected our opinion.

The Petitioner maintained that counsel never discussed the elements of a defense of alibi with him and that counsel never put on a defense of alibi at his trial. The Petitioner acknowledged that he did not tell the trial court that he had an alibi because he expected that counsel, to whom he had given the names of witnesses, would present that defense for him. He stated that he also informed counsel that Wanda Poole was using drugs and that there was a possible connection between her and the victims. However, the Petitioner testified that he did not believe that counsel interviewed Poole. He also maintained that counsel did not interview his mother or Bailey.

The Petitioner acknowledged that he walked out during one of his discussions with counsel. According to the Petitioner, he asked counsel what type of defense counsel was going to try to establish, and counsel responded that "[the Petitioner] didn't have a defense." The Petitioner testified that he told counsel that there was "no use" having counsel as his attorney and walked back to his cell at the Criminal Justice Center. The Petitioner testified that a security guard, who was in the room during the conversation, could hear everything he said to counsel, so he did not feel comfortable talking freely with counsel. The Petitioner testified that he conveyed his concerns about the security guard to counsel, but he was not sure if counsel took any steps to remedy the problem. He stated that all of the meetings with counsel took place in the same location with guards present.

On cross-examination, the Petitioner stated that Wanda Poole did not testify at his trial. When asked if Poole could be located at that time, he responded that he "guess[ed] not." He stated that Poole was listed in the indictment as a witness against him. The Petitioner claimed that instead of being with Poole at the victims' home on the night of the offense, he was at Sheila Bailey's home. He could not recall Bailey's address but stated that it was "off on past Briley Parkway" and that it was "like on Avey Street." The Petitioner testified that he arrived at Bailey's house around 5:00 p.m. on December 11, 1996 and left around 8:00 a.m. the next day. He maintained that he stayed at Bailey's house the entire night. The Petitioner stated that Bailey's children were also at her home that evening.

The Petitioner testified that when he left Bailey's house, Bailey drove the Petitioner's car and dropped him off at his mother's house. When asked what information he could not convey to counsel with the deputies in the room, the Petitioner responded,

"Well, just to explain . . . the different procedures about my case . . . ." He stated,
"First, I would explain to him, try to establish to him . . . in my behavior, how . . .
them people could have been shot, . . . for one, . . . they was trying to make like
everybody, . . . they was just two senior citizens, good Samaritans, but them two drug
addicts, . . . around in the neighborhood, . . . getting crack from everybody, different
peoples, . . . I tried, . . . I could have explained that to him, but I wasn't able to."

The Petitioner also testified that he would have told counsel that he knew the victims and that he had been in their house on a previous occasion.

When asked if counsel explained to him the State's proof in his case, the Petitioner replied, "Not really. I couldn't say, you know." He stated that it "was obvious" that the two victims could identify him in court as the perpetrator. The Petitioner testified that he told counsel where he was

at the time of the offense and that he had an alibi. He stated that he "left it up to [counsel] to take it from there and present it to the Courts." The Petitioner recalled that at the end of the trial, counsel announced that the defense was not going to present any proof.

On re-direct examination, the Petitioner testified that it was counsel's duty to present his case and that he relied on counsel to present his case. He stated that he did not feel that he could speak directly to the trial judge. The Petitioner explained that he is "not very sophisticated" in his speech or education level.

Counsel testified that he is an Assistant Public Defender for the Metropolitan Government of Davidson County. He stated that during an average week, he has no more than one jury trial, if any. However, he testified that during the time that he represented the Petitioner, he was a "Criminal Court floater," so his case load would have been "significantly smaller" than usual. He stated that he has been a practicing attorney since 1976.

Counsel recalled that on February 20, 1998, he was appointed to represent the Petitioner after the Petitioner's prior counsel moved to withdraw from the case. He testified that when he was appointed, the Petitioner's case was set for trial on April 20, 1998. Counsel stated that pursuant to his motion, the case was continued until June 22, 1998. He testified that he met with the Petitioner on eight occasions. He stated that at least five of those meetings lasted forty minutes. Counsel reported that he also had several additional brief encounters with the Petitioner in addition to the eight meetings.

Counsel described a meeting with the Petitioner that took place on June 17, 1998. He explained that the maximum security units at the Criminal Justice Center were under a great deal of renovation so that the "whole area was kind of torn up and basically it was a very noisy area in which there was absolutely no privacy." He testified that deputies were always close by and could overhear his conversations, which he believed impeded communication with the Petitioner. Following the June 17 meeting, counsel sent an email to Judge Blackburn and Assistant District Attorneys General Sharon Brox and Dan Hamm. He reported that he stated the following in the email:

> Please be advised I just met with [the Petitioner] to discuss final trial preparations and all was not well. He became upset about the matter and was concerned that I had not done enough to help him or to prepare his defense. He returned to his cell suggesting I was working with the prosecution to convict him. The physical situation didn't permit me to properly confront him and to process the issue (Mr. Hayes is in 4 max where the attorney visiting area has been under construction for months. The inmates may see their counsel only in the presence of deputies). I share this information only because it could impact the trial set for Monday.

Counsel could not recall specifically what caused the Petitioner to become angry during the June 17, 1998 meeting. He testified that his next meeting with the Petitioner occurred on June 19, 1998, and lasted two hours. Counsel testified that he spoke to the Petitioner about the defense of

alibi. He stated that he also spoke to the Petitioner about the possibility that three individuals might identify him as the person who shot the victims.

Counsel testified that the Petitioner claimed that one of the potential witnesses against him was with the Petitioner's mother at the time of the offense. He stated that in essence, the Petitioner was providing an alibi for one of the prosecution witnesses, Wanda Poole. According to counsel, Poole would have testified to the following regarding the night of the offense: that she was with the Petitioner; that she accompanied the Petitioner to the store; that on the way back from the store, the Petitioner wanted to stop at someone's house; that she knocked on the door of the home, that Tawanda Parker opened the door, and the Petitioner entered the residence behind Parker; that there was a discussion about borrowing an automobile, and the Petitioner pulled out a handgun, shot Mr. McLemore, and then shot Parker; and that as they were leaving, the Petitioner grabbed Poole by her blouse and told her that if she told anyone, he would kill her. According to counsel, this was Poole's initial account of the events, but she later "back-pedaled and got somewhat ambivalent."

Counsel testified that he had several reasons to question Poole's credibility: He stated that she waited several days before sharing the information with anyone, that her account "rather conveniently exonerated her from any kind of criminal responsibility," that she was "lacking some details" in her account, and that she had a personal relationship with the Petitioner. Counsel testified that the Petitioner claimed that Poole had been to the victims' home to purchase drugs. However, counsel acknowledged that the trial court would not allow him to introduce certain evidence regarding drug activity at the victims' home. Counsel testified that he had a brief phone conversation with Sheila Bailey in which she stated that she thought the Petitioner was with her on the night of the offense but claimed she was not positive. He testified that he also talked to the Petitioner's mother.

Counsel testified that he was provided with the State's discovery material in this case and was familiar with the State's case against the Petitioner. He stated that this was not an "overly complicated" case. Counsel testified that he spent a sufficient amount of time with the Petitioner to prepare the case for trial. He also reported that "[n]inety-percent of [his] trials are without a defense."

He acknowledged that the Petitioner wanted his mother and his girlfriend to testify. Counsel testified that he did not "think a girlfriend saying that she might have been with the Petitioner" would have been very persuasive to a jury. However, counsel explained that he "was not pleased with the quality of what their anticipated testimony would be." He also testified that if the Petitioner's mother had testified, she could have provided the State with a motive for the shootings. According to counsel, the Petitioner's mother would have stated that Parker had "repeatedly and annoyingly called" the Petitioner seeking to buy drugs, and she would have testified that she told Parker to call the Petitioner on his beeper.

On re-direct examination, counsel testified that he would have discussed with the Petitioner what the State's evidence would include. However, he stated that he probably did not tell the

Petitioner that he did not have a defense. Counsel acknowledged that his conversation with Bailey was brief. According to counsel, Bailey was only able to say that she thought she and the Petitioner were together on the night of the offense, but she could not remember the date.

Sheila L. Bailey testified that she and the Petitioner had "been together on and off for the last seven years." She recalled that on December 11, 1996, the Petitioner helped her move into her apartment and spent the night with her there. Bailey stated that she picked up the Petitioner at his mother's home and that the Petitioner was at her residence on Ivey Street with her until 10:30 a.m. the next day when she took him home. She testified that she drove the Petitioner home in her cousin's car the next morning. Bailey reported that her home is in west Nashville. She maintained that the Petitioner was with her the entire night. Bailey testified that she did not recall counsel or anyone from the public defender's office calling her about this case.

On cross-examination, Bailey testified that the Petitioner is the father of her thirteen-year old son. She stated that she has two other sons who are eighteen and sixteen years of age. Bailey reported that she moved some of her possessions from her former residence on December 10, 1996, and the Petitioner helped her move the remainder on December 11, 1996. She testified that she left work at 9:00 p.m. on December 11, 1996 and went by the Petitioner's mother's home to pick up the Petitioner. Bailey claimed that she did not know Tawanda Parker, the female shooting victim. Bailey was certain that she was not with the Petitioner at 5:00 p.m. on December 11, 1996 because she was at work. She testified that her three children stayed at their grandmother's house that night and did not go to Bailey's new house. Bailey testified that she did not find out right away that the Petitioner was arrested because she was not speaking to him. However, she testified that she remained on good terms with the Petitioner's mother.

Mattie Darnell, the Petitioner's mother, testified that on the evening of December 11, 1996, her oldest son, William Hayes, and Wanda Poole were at her house. She testified that Poole was a former girlfriend of the Petitioner. According to Darnell, Poole stayed at her house the entire night. On cross-examination, Darnell testified that she is a light sleeper and that she slept "partially" through the night. When asked what she was doing that night, Darnell responded,

> "I looked at TV. We talked back and forth. I answered the phone. I ran to the bathroom. I went and took a nap and back up answering the phone, going to the bathroom, talking to Wanda or either saying a few things to my other son because he also gets up at night."

Darnell testified that Parker called a "few" times that night trying to find the Petitioner. She stated that she told Parker that she did not know where to find the Petitioner and that she should "beep him." Darnell reported that Parker had previously been to her home. She testified that a friend called her the day after the offense and told her that the victims had been shot. Darnell recalled finding out that the police were looking for her son later that day. Darnell testified that she knew Bailey and saw her on the morning after the shooting. She stated that Bailey later told her that she was with the Petitioner during the time the offense occurred. Darnell testified that she told counsel that Wanda Poole was with her the entire night of the offense.

II. ANALYSIS

The Petitioner alleges that he received ineffective assistance of counsel at trial. Specifically, he contends that he was not able to adequately communicate with counsel based on the conditions at the Criminal Justice Center at the time of his detention. He also complains that counsel failed to present the defense of alibi. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have

been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

Following the evidentiary hearing on the Petitioner's petition for post-conviction relief, the trial court made the following findings:

First of all, I don't see any deficiency of [counsel]. He interviewed Ms. Bailey, or Batey, as he had written down. He made a comment like obviously she didn't remember and for him to go much further would probably have not been of much benefit and would run the risk of being accused of having told the witness what to say.

With regard to the mother's testimony, obviously, [counsel] had the information that he needed to make the decision not to use it because of the impact it would have on the actual trial.

He defended this case based on the issue with the identification, which on cross he made much of. Also, with the fact it was so inexplicable that it could not possibly have been premeditated and intentional. He was very much arguing for a lesser included offense, so that was the thrust of the defense.

Given the facts of the case, and I'll have to say this is one of the more overwhelming cases I've ever seen. It did not take the jury long, and part of it is my observations of the victims as they testified, which I have the benefit of that reading a cold record doesn't give you, but these witnesses knew the [Petitioner]. Ms. Parker had known him for three months. He had been to the house, had borrowed money previously. There had been no problems whatsoever with them. He came there to borrow a car, and it's just interesting. The identification was not compromised. When the paramedics finally got there and these people were left for dead. She kept trying to dial 911 because they are not paralyzed and Mr. McLemore is, he was awake a lot of the time, but he couldn't do anything given the way he was shot and they were just laying there in this bedroom waiting for people to find them. But the first thing they tell the paramedics is Ervin. He did this. I mean, there is no question that they knew who he was.

Now, the other interesting thing was the photo lineup, and that is the police were trying to verify who they were talking about just to make sure. Detective Pierce first takes a lineup that doesn't even include the picture of the [Petitioner] to them in the hospital and they don't identify anybody, and as soon as they get a photo with him in it, that is absolutely him. There is no question about the identification and no question about their testimony.

It was an overwhelming case. [Counsel] did the best he could under the circumstances, made very good decisions, so given all that, plus the issue with regard to the interview over in the jail, [counsel] also testified there was one difficult interview that he brought to my attention, and I'm sure I probably said something, it's not in the record, but to the effect of do you need me to do something with this, and then he had a subsequent interview that lasted two hours, so whatever problems might have occurred early on, they were at least resolved by trial, so with all this, I'll

issue a written order, but at this point, I'm going to deny the petition, but I will issue a written order.

From the record before us, we conclude that the Petitioner has failed to show that counsel's representation fell below the range of competence of attorneys in criminal cases. Both victims testified unequivocally that the Petitioner was the person who shot them. Although the Petitioner argues that counsel should have presented the defense of alibi, counsel made a strategic decision based on the proof not to do so. Counsel testified that when he spoke to Bailey, she did not seem sure that she was even with the Petitioner on the night of the offense. Counsel also testified that allowing the Petitioner's mother to testify would not have been strategically sound because she could only testify that she was with one of the prosecution's witnesses at the time of the offense. Moreover, counsel noted that the Petitioner's mother could have inadvertently provided the prosecution with a motive.

Regarding the Petitioner's argument that he was not able to adequately communicate with counsel, we note that counsel testified that he met with the Petitioner on eight separate occasions and that at least five of those meetings lasted a minimum of forty minutes. Counsel testified that he discussed the case with the Petitioner and discussed the possibility of presenting the defense of alibi. Although the Petitioner testified that he was uncomfortable talking to counsel with deputies present, he failed to articulate what information he was unable to convey to counsel during those meetings.

Thus, we conclude that the trial court properly found that counsel was not deficient in his performance. Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE